Félix Agosto, Plaintiff and Appellee, *v.* Porto Rican Express Co., Defendant and Appellant.

No. 5925. Argued November 7, 1934.—Decided January 17, .1935.

*Juan B. Soto* for appellant. *Arturo Aponte* for appellee.

Mr. Justice Aldrey delivered the opinion of the Court.

The private corporation Porto Rican Express Company took this appeal from a judgment ordering it to pay a certain amount of money to plaintiff Félix Agosto as damages for the death of his son Esteban Agosto, which happened on October 25, 1927, when he was seventeen years old, in consequence of injuries received in a collision between him and a truck used by the appellant in its business.

One of the grounds for this appeal, as averred by the appellant corporation, is that the lower court committed an error in weighing the evidence when it concluded that there did not exist a valid contract of compromise between the parties to this suit in regard to the cause of action exer-

cised by the plaintiff. Of course, we will study and decide this question because if the compromise was proved, then it will be unnecessary to decide whether this accident occurred due to the carelessness or negligence of the employer of the appellant, since the contract of compromise is one which according to Section 1717 of the Civil Code has, between the parties, the authority of *res judicata*.

The trial of this cause took place in the District Court of Humacao on January, 1931.

Esteban Agosto was the son of Félix Agosto and his wife, Sabina Valentín. He lived with them in the town of Ceiba, where the accident that occasioned this suit and his death, occurred.

Ramón Arias, who lives at San Juan and is an employee of the Maryland Casualty Company, who in turn insured the truck of the defendant against accidents, testified at the trial that he went to the town of Ceiba on October 26, 1927, and made an investigation of the accident occurred to Esteban Agosto. That in the afternoon he went to the cemetery where they were burying the deceased, and that he spoke there with Félix Agosto and offered him his condolence for the death of his son, and further told him to go to his office in San Juan, when he deemed it convenient, in order to arrive to an amicable compromise, that he did it because it is the company's policy to compromise, if possible, even though not liable for the accident: that the conversation took place in the presence of a brother of Félix Agosto, who advised an amicable compromise with the company; that on the second day of next November, seven days later, Félix Agosto, Cristino Meléndez, and Luis Ramos came to his office at San Juan; that he had not met the other two persons before; that they told him they came to speak about the son of Félix Agosto; that the latter and Luis Ramos, who acted as his lawyer, asked for $1,000 as settlement, but that after several offers on both sides they arrived to the amount of $650; that a document with its copy was drawn up wherein Félix

Agosto, in consideration of said amount, relieved and released the defendant of all liability for the death of his son Esteban; that on said document Félix Agosto made his mark —because he does not know how to sign—and Cristino Meléndez signed as witness; that when Luis Ramos was also going to sign, the witness thought that said release should also be signed by the wife of Félix Agosto and he told them so, and also told them that he was willing to go to Ceiba to get that signature; that another similar instrument with copy was drawn up in order to get the signature of both spouses; that the four of them left that afternoon at five o'clock for Ceiba for that purpose, where they arrived at seven P. M.; that on the way this witness told Félix Agosto to explain to his wife the compromise he had entered into; that upon arriving to Ceiba the four of them went to the house where Félix's wife was with other people; that Félix Agosto told his wife Sabina Valentín of the compromise he had entered into with the company for $650, to which she answered that whatever he did was all right, and she made her mark in the instrument and its copy; that thereafter the four of them left for Cristino Meléndez's home where Félix Agosto made his mark in the document his wife had signed, and Cristino Meléndez and Luis Ramos signed as witnesses; that he read to them this release and gave to Félix Agosto a check of the insurance company for $650, drawn in the name of both spouses; that he told the plaintiff how they should indorse it, writing on its back what the indorsement should contain; and that he did not return to Ceiba after the burial of Esteban Agosto until November 2, at night, when he went with the three people that had gone to San Juan.

There appears in the record a document with its copy wherein Félix Agosto, in consideration of the amount of $650, relieves the defendant of liability for the death of his son Esteban. Both the original and the copy are marked with a cross between the words "Félix Agosto," and there appears also a signature that reads "Cristino Meléndez."

There is also another document with its copy wherein Félix Agosto and Sabina Valentín relieve the defendant from liability for the aforesaid accident, which document is marked with a cross between the words "Félix Agosto," and with another one between the words "Sabina Valentín," and they bear signatures that read "Cristino Meléndez"—"Luis Ramos." Those documents and their copies are printed, with blanks filled with a typwriter. The text thereof is in English and Spanish, and the Spanish is given preference in the printed matter, for it appears in larger type than the English, and the blanks typewritten are in Spanish only. A check for $650 was also offered, made out in yellow paper to the order of Félix Agosto and Sabina Valentín.

The evidence of the plaintiff concerning the compromise consisted in his testimony, that of his brother Gil, and that of Cristino Meléndez.

Gil Agosto testified in regard to the conversation had by him and his brother Félix with Arias, who told them that the Express Co. was insured and that they would be indemnified; that Arias gave them his name so that they would go to San Juan, and told them not to give the case to a lawyer because the money belonged to the family if they made the compromise; that when he spoke in that sense it was about a money settlement; and that after that day he saw Arias go by in an automobile very often.

Cristino Meléndez and the plaintiff live in Ceiba. They went with Luis Ramos to Arias' office, in San Juan, on November 2, and the three of them returned to Ceiba with Arias. They arrived to plaintiff's home at seven P. M., and the four of them entered to the parlor where Sabina Valentín, the wife of Félix Agosto, was with other people.

Cristino Meléndez testified concerning the settlement that he went to San Juan with Luis Ramos and Félix Agosto because he told him that he wanted him to go there since they had gone to get his testimony two or three times. After this statement the following questions were asked to and an-

swered by Cristino: "Q.—And if you had no interest in this matter, why did you make a trip to San Juan together with Félix Agosto, and thereafter you came to Ceiba and signed those documents? A.—He told me when I was leaving for San Juan that same day, to go there with him that I might show him the number of the house, and I told him that I did not know very well, but that Luis Ramos knew how to read, and we were going together and he told me: 'Let us go, that I am going to show you.' Q.—You don't know how to read? A.—No, sir. Q.—And you went with Félix Agosto as an expert and you don't know how to read? A.—Luis Ramos went. I was at San Juan, but he asked me to go there and I told him that I didn't know and then Luis Ramos went with us." Later, upon questions by the attorney of the plaintiff, he stated that he had a store, and upon being asked what happened at the store he answered: "Well, Luis Ramos was there who had come home for a visit, and that gentleman was there investigating. Q.—Mr. Luis Arias? A.—Yes, sir. I know him by sight, and after they talked, then he talked with Luis Ramos and Luis Ramos spoke with me.—Hon. Judge: Speak louder, I can't hear you.—Witness: He asked me then, to go to San Juan.—Hon. Judge: Who spoke? A.—Mr. Arias.—Attorney Aponte: This gentleman spoke with Luis Ramos and with you? A.—Yes, sir. Q.— Had Félix Agosto spoken with you about this? A.—No, sir. Q.—Félix Agosto had not spoken with you and already Mr. Arias was speaking with you and with this Ramos in your store? A.—Yes, sir. A.—What was Arias' purpose in speaking with you and with Luis Ramos? A.—That we would take Félix Agosto there. Q.—To take Félix Agosto where? A.—To San Juan. Q.—Where did you have to take him in San Juan? A.—He left the address that afternoon, to Tanca Street, I believe it was number four. Q.—That is to say, that the first conversation you had respecting this particular was precisely due to Arias' visit to your store? A.—Yes, sir. Q.—What is the occupation of Luis Ramos?

A.—He was then employed in the Collector's office carrying bundles and he was always going here and there. Q.—By reason of what Arias told you and Ramos, what did you do then with Félix Agosto? Then, who spoke to Félix Agosto about you? A.—Luis Ramos. Q.—And what did you do with Félix Agosto? A.—Well, that on the next day Luis Ramos told him . . . Q.—After the conversation with Arias that you had with Luis Ramos, what did you and Luis Ramos do with Agosto? A.—We were in his home. Q.—We were . . . who are we? A.—Luis Ramos and Cristino Meléndez. Q.—What did you and Luis Ramos tell Félix Agosto when you went to see him? A.—That we should go to San Juan; that Luis Ramos knew the house better, where it was. Q.—Why did Luis Ramos know the house better where it was? A.—Because he had gone before. Q.—Why do you know that Luis Ramos had gone before? Attorney Iriarte: That is hearsay. The witness should not testify from hearsay, let Luis Ramos come and state it. Attorney Aponte: all right, Luis Ramos is here.'' In regard with what occurred in San Juan and at night in Ceiba, this witness stated that he did not remember having signed anything in San Juan, but when he was shown a signature that reads Cristino Meléndez he stated that it was his, that he signed the papers there. When he was asked whether he signed again thereafter, he answered that he did not recall whether he had signed there, or when they returned at night: that he signed twice and that he does not remember if those were the only ones or whether he has signed other times. Concerning this point we transcribe the following: ''Q.—Do you remember if you signed there or here only? A.—I can not remember whether I signed here or signed there; I think it was here. Attorney: See if you recognize this document . . . Q.—Look at that signature, this one that reads Cristino Meléndez is that yours? A.—Yes, sir. Q.—Is that your signature? A.— Yes, sir. Q.—You don't remember whether you signed at Ceiba or San Juan? A.—I can not remember, there are so

many papers. Q.—There are four papers, there are four signatures that you have identified. A.—Well, there are two here. Q.—But you have acknowledged these ones also, yours, the one that reads Cristino Meléndez is the one I ask you to identify. A.—Yes, it is mine. Q.—Yours? A.—Yes, sir. Q.—You do not remember where you signed, whether at Ceiba or at San Juan? A.—No, sir.'' Concerning what happened at San Juan this witness stated that Arias told Félix Agosto that he had ordered an investigation that he might have a right at any time; that no investigation was made there, that it was made when they arrived to Ceiba at night; that upon arriving in Ceiba to Félix's house, Arias asked the wife of the former her name, her age, that of her son and whether he was at school. Then he took Félix's declaration concerning all that had occurred and Arias took out a notebook and asked Sabina to sign there, and as she stated that she did not know how to sign, she made two marks; that thereinafter the four of them went to the witness' home and he and Luis Ramos signed there; after that Arias gave Félix Agosto a yellow paper; that in his presence they did not speak of a compromise but of an investigation. After stating that he had only signed twice he answered a question to the effect that the four signatures belonged to him and that he saw when Sabina and Félix made the marks in the documents. That one document bears two of his signatures and that there are two more in another one. In regard with what happened in Félix Agosto's house when the four of them arrived there, there appear the following questions and answers: ''Q.—And did you say you were praying at the wake being held at Félix Agosto's home? A.—At the novena, praying. Q.—And you arrived at the time of the novena? A.—Yes, sir. Q.—Did the novena come to an end or didn't it? A.—When we left it hadn't finished yet. Q.— Then the novena had ended when you arrived or hadn't it? A.—They were all gathered but I don't know whether they were or were not praying. Q.—I believe I heard you say

they were praying? A.—They were all praying. Q.—Upon arriving they were gathered but were not praying, then the statements made there were seen by everyone? A.—Yes, sir."

Plaintiff Félix Agosto testified that he knows Ramón Arias as he has seen him five or six times, the first time at the cemetery where Arias spoke to him, and also to another person; that the second time was when the witness was working and upon Arias going by he stopped and told him he had come to get him because he wanted him to go to San Juan in order to make an investigation of the case and take some declarations because the case was very important and it was up to him to settle it. Thereafter the following examination by his attorney took place: "And after that, when did you see him again? A.—After that I did not see him again, thereafter I met another individual . . . Q.—What was the name of that person? A.—Well, he arrived . . . Q.—Was he sort of a pettifogging lawyer? A.—Sir, a man who proved to be a gentleman. Q.—What is his name? A.—His name is Don Luis, don Luis Mora, I believe his name is. Q.—Well, he came home and it seems he was investigating the case, what had happened to me, what had taken place. And I, as I thought nothing yet, I paid no attention, because I had no notice of it. Well, and he told me: I have come precisely because I have been commissioned to take you to San Juan because the firm wants to see you; and it is well that you go because they want to make an investigation and take your declaration. Q.—What did you do afterwards? A.—We went to San Juan. Q.—Who else did you go with? A.— With Mr. Cristino Meléndez, in an automobile." He went on saying that at San Juan Arias asked him whether he was married, his age, whether his child was legitimate, the age of the latter and whether he attended school, all of which he answered. He was then asked: "What did you do then? A.—We came back a short while afterwards. Q.—Did anyone accompany you? A.—The same ones that were there, the same three." To a subsequent question he answered

that Arias went with them in the car to Ceiba. He stated that when he arrived to his home he went upstairs to lie because his body was aching; and further stated that he (Arias) arrived and asked for Mrs. Valentín to whom he asked the same question he had asked him concerning her age, etc., and thereafter she made her mark on some blank sheets of paper, with nothing on them; that he made there two marks on two blank sheets of paper and Sabina also made two; that thereafter Meléndez signed at his store and also Ramos, and after that Arias gave a yellow paper to the witness. Upon cross-examination he stated that he heard the conversation his brother Gil had with Arias at the cemetery, but he did not hear what he testified concerning Arias' statement about it being an investigation and not a compromise; that nothing was said in San Juan respecting money, and that Arias gave him nothing to sign. He stated afterwards that he did not sign a paper with anything written on it, but a blank one; that he left for San Juan at 8:00 A. M. and remained there until noon. Upon being asked how long was he at the office he stated that long enough to give his declaration to Arias, and then he went to the street and remained in San Juan until noon. Thereafter he stated that he left Arias' office with him, with Meléndez, and with Ramos; that Arias told them that he was going to Ceiba in order to take Sabina Valentín's deposition; that they arrived to his home at seven o'clock at night. Upon being asked if he went to his wife when he arrived to the house and explained to her the agreement he had entered into with the company, he answered thus: "Oh, I don't know"; he did not tell her to sign. Upon being asked what documents he said he had signed in blank, he answered: "Well, as he asked us to sign and we did not know how to read or write, my wife signed first and he told me: 'sign here old man' thinking that it was as he had told me''; that the paper was blank, without lettering; that he signed a document handed him by Arias thinking that it was a declaration of his age, that of his wife

and of his son; that he did not get Meléndez or Ramos to accompany him to San Juan but that they offered to do so; that Meléndez told him·he was going to San Juan and that he could show him the house if he wanted; that Meléndez and Ramos were not his friends but as they were more experienced he went with them; that he did not look for them but that they fetched him and took him there.

We have not totally transcribed the testimony of Cristino Meléndez and of Félix Agosto because of their length, but we are of opinion that the résumé we have made of them and the extracts we have transcribed are sufficient to understand the natuře of that testimony and to form an opinion of them.

The evidence of both parties concerning the compromise convinces us that the lower court committed a manifest error in arriving to the conclusion that it could not believe and did not believe in the existence of said contract of compromise, which is equivalent to stating the testimony of Arias was not believed, according to which testimony there had been a compromise. We are of opinion that the preponderance of the evidence is clearly in favor of the defendant appellant, as we shall show.

The testimony of witness Arias has nothing in itself to make it unbelievable or unworthy of credit. It seems natural that an employee of an insurance company should try to prevent claims against the company through compromises even though he were to believe that the company is not liable therefor, thus evading the eventualities of a suit and the expenses thereof. We see nothing reprehensible in it that may make conduct unbelievable or incredible. There was not the slightest duress on his part in order to arrive to a compromise with the plaintiff, in representation of his company. He merely asked them to go to his office in San Juan to attempt a compromise. Neither does the fact that having gone to Ceiba on the day following the accident in order to make an investigation of it, that he went to the cemetery while

they were burying Esteban Agosto, and on that spot he expressed his condolence to the plaintiff and made this offer of compromise to Gil Agosto, make his testimony any less credible; nor the fact that upon arriving to Félix Agosto's home at night for the purpose of securing his wife's signature, that she was there together with other people saying a rosary or praying. On the other hand, his testimony concerning the compromise was corroborated by that document to that effect signed by Cristino Meléndez in San Juan after Félix Agosto had made his mark on it; and by another document of the same nature signed in Ceiba with the marks of Sabina Valentín and Félix Agosto on which Cristino Meléndez and Luis Ramos signed as witnesses, as well as by the check for $650 received then by the plaintiff, which is not an insignificant amount.

Luis Ramos sometimes called Luis·Mora, was not offered as a witness at the trial. He seems to be the most intelligent one of the three that went to San Juan to see Arias, and who, according to the plaintiff, acted as an honest man.

Truly, Arias' testimony was not substantially contradicted by the plaintiff and his witness Meléndez, for they admitted having gone to Arias' office in San Juan; that there they signed the compromise agreement entered into by Félix Agosto without his wife wherein the signature of Luis Ramos does not appear; that they arrived to Ceiba at 7:00 P. M. accompanied by Arias; that there both spouses signed a document with Meléndez and Ramos signing as witnesses, and that Arias gave the plaintiff a yellow paper which is a check in favor of the said spouses drawn by the insurance company.

Arias' testimony was not overthrown because the plaintiff and Meléndez stated that they had gone to San Juan for an investigation that Arias intended to carry on, because Gil Agosto testified that Arias told him to go to San Juan to enter into a compromise for a consideration; because Meléndez testified that Arias made no investigation in San

Juan; because Félix Agosto testified that he was asked whether he was married, the name of his wife and their age and the age of their son, the very same thing he asked Sabina Valentín, and because whether they went to San Juan for an investigation or not, the fact is that they arrived to a compromise, as shown by the documents in record and their acknowledged signatures. Furthermore, the testimony of Félix Agosto and Meléndez can not overthrow that of Arias because they are contradictory in themselves and to each other, and unbelievable. For example, Cristino Meléndez testified that he went to San Juan because he was invited by Félix Agosto; thereafter he stated that he went to see Félix Agosto to tell him to go to San Juan, and in another part of his testimony he was in San Juan. After that witness denied having signed those documents of compromise, they were shown to him and he acknowledged he had signed twice on them, and afterwards admitted having signed four times, which is the number of signatures it bears. He also testified that when they arrived to Ceiba they were praying but later stated that he does not know whether they were or were not praying.

Félix Agosto stated that he saw Arias five or six times but later said it was twice. He stated likewise that when he arrived to his home he went upstairs to lie because his body ached, but none the less he told what had happened in the parlor of the house with Arias, with whom he left afterwards for another place where the witnesses signed, and he received from Arias a yellow paper. He also said that the papers where he made his mark were blank but it appears from them that they were printed. In another place he testified that the ones who left from San Juan were the three that had gone there, but later stated that Arias was with them.

The testimony of those two witnesses is of such a nature that they can not overthrow the evidence introduced to prove that the plaintiff relieved the defendant of all responsibility

for the death of Esteban Agosto through a contract of compromise.

We find nothing in the instant case that tends to show fraud on the part of Arias in order to enter into the contract of compromise agreed upon. The cases of *Colón* v. *Méndez,* 41 P.R.R. 865, and *De Jesús* v. *Singer Sewing Machine Co.,* 46 P.R.R. 694, cited by the appellant, have no application to the case at bar because the circumstances under which the compromise were entered into are different to those of the instant case.

The judgment appealed from should be reversed and another one rendered dismissing the complaint without special imposition of costs.

Mr. Justice Wolf took no part in the decision of this case.